# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
August 3, 2010 Session

## STATE OF TENNESSEE v. DAWN KATHLEEN DAVIDSON

**Direct Appeal from the Circuit Court for Chester County**
**No. 08-CR-93      Roy B. Morgan, Jr., Judge**

---

**No. W2009-02313-CCA-R3-CD  - Filed March 3, 2011**

---

A Chester County jury convicted the defendant, Dawn Kathleen Davidson, of attempted first degree murder, a Class A felony, and the trial court sentenced her as a Range I, standard offender to twenty-three years in the Tennessee Department of Correction.  On appeal, the defendant claims that (1) the trial court erred by denying her motion for a bill of particulars; (2) the trial court erred by preventing her attorney from fully cross-examining the state's witnesses; and (3) her sentence was excessive because the trial court incorrectly applied an enhancement factor and erroneously failed to apply any mitigation factors.  Following our review, we conclude that the defendant waived all issues other than sentencing.  Finding no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and JOHN EVERETT WILLIAMS, JJ., joined.

Ryan B. Feeney, Selmer, Tennessee, for the appellant, Dawn Kathleen Davidson.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; James G. Woodall, District Attorney General; and Jody Pickens and Al Earls, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Background

   In November 2008, a Chester County grand jury indicted the defendant, Dawn Kathleen Davidson, and her father, Jimmie David Stiddom, for the first degree murder of

Ronald Perkins and for tampering with evidence, a Class C felony. The state dismissed the tampering with evidence charge on June 11, 2009. The court granted the defendant's motion to sever her trial from the co-defendant's, and the case went to trial on June 23, 2009.

At trial, Deputy Jeremy Wilson, of the Chester County Sheriff's Department, testified that he responded at approximately 2:30 p.m. on March 24, 2008, to a call that a man had been shot at 1995 Sweet Lips Road. He arrived simultaneously with other officers and observed that the defendant and Timmy Davidson were outside of the residence in the driveway. Deputy Wilson frisked the defendant before placing her in his patrol car, and he discovered three live .22 caliber bullets in her left front pocket. He collected the bullets, which he later put into an evidence bag and gave to Investigator Jason Crouse. After placing the defendant into his patrol car, Deputy Wilson and Investigator Mark Griffin entered the residence to locate the shooting victim. They found the victim slumped over with his back against a wall, surrounded by a large pool of blood. Deputy Wilson testified that he, Investigator Steve Davidson, and Investigator Griffin searched the house. Deputy Wilson located two live .22 caliber bullets and two spent .22 caliber casings, which someone else collected.

On cross-examination, Deputy Wilson testified that he observed a bullet hole in the wall above the victim's head, but he did not know whether anyone retrieved the bullet.

Investigator Steve Davidson, of the Chester County Sheriff's Department, testified that he responded to a shooting call at 1995 Sweet Lips Road on March 24, 2008. Investigator Davidson said that, after Chief Deputy Gly Weaver photographed the two live .22 caliber bullets found in the residence, he collected them and gave them to Investigator Crouse.

Investigator Mark Griffin, of the Chester County Sheriff's Department, testified that he responded to a shooting call at 1995 Sweet Lips Road on March 24, 2008. Investigator Griffin said that when he arrived, two people were in the driveway. They identified themselves as Timmy and Dawn Davidson. Mr. Davidson advised him "that his wife . . . had to shoot a man." Investigator Griffin entered the residence to determine the condition of the victim, whom he found slumped against a wall. He said that the victim appeared to be deceased. He testified that he had observed a .22 caliber bolt action rifle outside of the residence by the back door. Investigator Griffin collected two spent .22 caliber casings and gave them to Investigator Crouse. Investigator Griffin testified that a green Dodge or Plymouth vehicle was parked in the driveway of the residence. He learned that the vehicle was registered to the victim and Ann Perkins. Investigator Griffin located a bullet hole in the wall above the victim's head. He testified that he did not see a way to retrieve the bullet.

Investigator Griffin further testified that he took a written statement from the defendant at the scene. She told him that the victim had raped her "[s]ometime between Thanksgiving and Christmas" and had threatened to kill her if she told anyone. She said that she reported the rape to the McNairy County Sheriff's Department. The defendant told Investigator Griffin that the victim had driven by her house several times and would slow down and honk. She said that on that day, she was doing laundry when she heard someone knock on her door. She thought it was a friend, so she told the person to come inside. She said that Mr. Davidson was in the bathroom at the time. The defendant said that she went down the hallway with a gun because she was afraid of the victim. When she saw the victim standing in her living room, she shot him, and he fell. The defendant said that she shot him again when he tried to get up, and she shot him a third time when he continued to try to get up. Investigator Griffin said that the defendant reviewed and signed her written statement. He said that he asked her when she had last communicated with the victim. She reported that she had called him that morning. Investigator Griffin told her that he would have more questions and asked her to accompany him to the sheriff's department. She agreed to do so.

Investigator Griffin said that the defendant was not under arrest at the time that they arrived at the sheriff's department, but he advised her of her *Miranda* rights, which she waived. In the defendant's second statement, she said that the victim raped her "several times between Thanksgiving and Christmas of 2007." She said that she reported the rapes to the McNairy County Sheriff's Department but was unaware of any action taken. The defendant said that the victim had driven by her house several times, and her husband reported it to the McNairy County Sheriff's Department. The defendant said that on March 24, 2008, she called the victim at Larry Johnson's house from a phone at the Finger Store so that her husband would not know what she was doing. She told the victim that she and her husband were no longer together, and he told her to call him back and that he would come over. She could not remember whether she called him back. The defendant said that while she was doing laundry, she heard a knock at the door and invited the person in, thinking that it was a friend. She said that the victim came inside and that he could not see the gun in her right hand. She said that he told her, "I'm going to do it to you again," and she shot him three times. The defendant said that she "thought if [the victim] showed up [Mr. Davidson] would whip his ass." Investigator Griffin testified that the defendant reviewed and signed her second written statement. He used a gunshot residue kit to collect any possible evidence from her hands.

On cross-examination, Investigator Griffin testified that the bullet hole in the wall was just below the ceiling, and it appeared to him that the bullet passed through the wall and into the ceiling. He testified that in the course of the investigation, Mr. Davidson gave several statements, which were inconsistent with each other. Investigator Griffin said that the

-3-

defendant told him, between her first and second statement, that she called the victim to tell him not to drive by her house.

Dr. Paul Schwartz testified that he was a family physician and served as the Chester County Medical Examiner. He testified that he went to 1995 Sweet Lips Road on March 24, 2008, and determined that the victim was deceased. Dr. Schwartz said that he initially noted two gunshot wounds to the victim's face and head. Dr. Schwartz testified that he does not perform autopsies, so he had the victim's body transported to the state medical examiner.

Dr. Bruce Levy testified that he was the chief medical examiner for Tennessee. He performed the autopsy of the victim's body. Dr. Levy testified that the toxicology report revealed cocaine metabolites, which indicated that cocaine had "metabolized out of his system, but he still had what was left over after the cocaine was broken down." The toxicology report also noted the presence of alcohol in the victim's system. Dr. Levy testified that the victim suffered three gunshot wounds to his face. He said that his description of the wounds did not indicate the order in which the victim received them. Dr. Levy said that the wound located on the victim's left eyebrow indicated that the barrel of the gun was at most six inches from the victim's head when fired. Dr. Levy testified that he recovered bullet fragments from the victim's brain, and he said that the bullet damaged half of the victim's brain and was a fatal injury. He testified that the victim also had a gunshot entrance wound beneath his right eye and a corresponding exit wound in front of his left ear. He said that the bullet did not enter the brain but was nonetheless a fatal injury. Dr. Levy said that the third entrance wound was in the victim's mouth. He said that the bullet damaged the victim's tongue and soft tissues and exited through the victim's jaw. He categorized the wound to the victim's mouth as serious and potentially fatal, and he said that a person could bleed to death over a period of time from such a wound. Dr. Levy said that his office photographed and catalogued the victim's clothing and personal effects, which included a cigarette lighter, cigarettes, a beer can, jewelry, and keys.

On cross-examination, Dr. Levy testified that the victim died of multiple gunshot wounds and that he could not isolate one injury from the others as the cause of death.

Investigator Jason Crouse, of the Chester County Sheriff's Department, testified that he was in charge of the investigation in this case. He said that he checked for gunshot residue on Timmy Davidson at the scene on March 24, 2008. Investigator Crouse testified that on March 25, he collected Mr. Davidson's clothing that he had worn the day before, and he collected the defendant's clothing from the property room at the county jail. Investigator Crouse said that Mr. Davidson advised him that he had attempted to clean the victim's blood from his residence while wearing the clothes that Investigator Crouse collected. Investigator Crouse testified that he submitted the live rounds collected from the defendant, the live

rounds found inside the residence, the shell casings, the rifle, the defendant's gunshot residue kit, Mr. Davison's gunshot residue kit, the defendant's clothing, Mr. Davidson's clothing, and the bullet fragments recovered by the medical examiner to the Tennessee Bureau of Investigation Crime Lab. Investigator Crouse testified that the rifle recovered at the scene was a bolt action, and while the gun could have a magazine, investigators did not find a magazine at the scene.

On cross-examination, Investigator Crouse agreed that the testimony given by Mr. Davidson at the preliminary hearing in this case differed from the first two statements that he gave. Investigator Crouse said that he was unable to verify Mr. Davidson's preliminary hearing testimony. He testified that he recovered a nine millimeter handgun in connection with this case, which he believed Mr. Davidson fired at the victim on March 24. Investigator Crouse did not submit the handgun for further examination because he did not have a bullet fired from the gun for comparison. Investigator Crouse said that he developed a second suspect, Jimmy Stiddom, from the information given to him by Mr. Davidson. He investigated the co-defendant, who confessed to firing the third shot at the victim, and the state ultimately charged the co-defendant with murder. Investigator Crouse said that he believed the co-defendant's statement that he fired the third shot, despite the defendant's statement that she fired the third shot. He testified that he did not perform a gunshot residue test on the co-defendant, who made the 911 call on March 24, because he did not believe he was involved.

On redirect examination, Investigator Crouse testified that he recovered the nine millimeter handgun on August 14, 2008. He located the handgun through information given by the co-defendant. He also said that a private investigator, Guy Buck, hired on behalf of the defendant, photographed the nine millimeter in the co-defendant's home at some point. Investigator Crouse stated that Mr. Davidson said that he fired the nine millimeter after the defendant had shot the victim once. The bullet hit the ceiling because the defendant grabbed Mr. Davidson's arm as he fired.

On recross-examination, Investigator Crouse testified that Mr. Davidson originally told him that he was in the bathroom when all of the shots were fired. He later told Investigator Crouse that he accidently discharged the nine millimeter.

Agent Mark Dunlap, a forensic scientist at the Tennessee Bureau of Investigation Crime Lab, testified that he examined the defendant's and Mr. Davidson's clothing for the presence of blood. He located blood on the defendant's blue jeans and Mr. Davidson's coveralls. Agent Dunlap said that the blood on the coveralls belonged to the victim, but the blood on the defendant's blue jeans had a female profile.

Agent Laura Hodge, a forensic scientist with the Tennessee Bureau of Investigation Crime Lab, testified that she examined the gunshot residue kits collected from the defendant and Mr. Davidson. Agent Hodge testified that results from both kits were inconclusive, and she noted that "some [.]22 rimfire ammunition does not have all the elements needed for gunshot residue analysis."

Agent Donald Carman, a forensic scientist with the Tennessee Bureau of Investigation Crime Lab, testified that the .22 caliber shell casings found at 1995 Sweet Lips Road had been fired from the .22 bolt action rifle found at the same location. He testified that he could not conclusively determine whether the bullet fragments removed from the victim had been fired from the bolt action rifle because the fragments were too mutilated. He said that the bullet fragments were from a .22 caliber bullet. Agent Carman said that without a magazine, he had to manually load each cartridge into the rifle to fire multiple shots. He also said that he had difficulty operating the rifle because of a loose pin and that the rifle did not fire reliably. Agent Carman testified that he determined that the same manufacturer made the bullets found in the defendant's pocket and the bullets found inside the residence, and he said that the fragmented bullet recovered from the victim was consistent with the same manufacturer.

Joseph Cadle testified that in February 2008, he was a deputy for the McNairy County Sheriff's Department. He said that on February 24, 2008, he responded to a rape call at 1995 Sweet Lips Road. Mr. Cadle said that the defendant reported that the victim had raped her "[a]round Thanksgiving." Mr. Cadle had the defendant write a statement describing what happened. She wrote that the victim came to the Davidsons' home, and Mr. Davidson asked him to take the defendant to the store to buy cigarettes. The defendant wrote that she drove because the victim had been drinking, but approximately halfway to the store, he told her to pull over so he could drive. She wrote that he raped her after she pulled the car over, and after the rape, they drove to the store. She bought the cigarettes, and they returned to the Davidsons' house. The defendant wrote that the victim threatened her life and her husband's life if she ever told her husband. Mr. Cadle said that he discussed the case with the district attorney, who advised him that nothing could be done because of the length of time that had passed.

Bob Gray testified that he was an assistant district attorney general for the 25th Judicial District. He said that after reviewing the documents pertaining to the defendant's alleged rape and discussing the case with the responding officer, the sheriff, the county investigator, and his supervisor, he determined that there was not sufficient probable cause to charge the victim. General Gray said that some factors in his determination included the length of time between the alleged rape and the report, the fact that the defendant could not remember the exact date on which the alleged rape occurred, the lack of medical evidence,

the "lack of believability" of the defendant's story, and the difficulty of proving in which county the alleged rape occurred.

Leslie Hildebrandt testified that she was the victim's sister. She said that in November 2007, the victim lived with their father, who was very ill. Ms. Hildebrandt said that she called their house either Thanksgiving Day or the day after Thanksgiving, and a female answered the phone. She said that she called again in December and a female answered.

Carol Defoul testified that she was the victim's sister. She said that after their father passed away, the victim moved into Larry Johnson's house in Finger, Tennessee.

Larry Johnson testified that he knew the defendant because he was the defendant's landlord in 2007. He said that he also knew the victim because he rented a room to the victim after his father died. Mr. Johnson recalled that a female called for the victim at 9:22 a.m. on the day that the victim died. He said that he answered the phone and gave it to the victim, who spoke with the caller for one or two minutes. Mr. Johnson said that the victim left the house at approximately 2:30 p.m. that day.

Hugh Branson testified that he was the manager of the Finger Discount Store in Finger, Tennessee. Mr. Branson said that he knew the defendant because she frequented his store. He was also acquainted with the victim, whom he had met twice. He recalled that the defendant, her husband, and the victim visited his store in December 2007. The defendant and the victim came together to his store in January 2008. Mr. Branson testified that the defendant came to his store on March 24, 2008, bought cigarettes, asked to use the store's phone, and made a phone call outside. He said that he saw the defendant again between 1:30 and 2:00 p.m. that day, and she made another phone call from the store phone. Mr. Branson said that he did not know whom she called either time.

*Defense Proof.* Timmy Davidson testified that he was married to the defendant. He said that at some point prior to March 24, 2008, he learned that the victim had raped his wife. Mr. Davidson testified that he was angry and told someone that he was going to kill the victim. He reported the alleged rape to the police and also called the police to complain about the victim's attempts to stop in their yard. According to Mr. Davidson, he did not know that the victim was coming over to his house that day. Mr. Davidson testified that he was in the bathroom when he heard the first shot. He said that when he first saw the victim, he was sitting against a wall. Mr. Davidson said that he grabbed his gun from under a mattress and pointed it at the victim, and he asked the victim why he was in their house after raping his wife. The victim looked at him, and he could see the bullet wound to the victim's head. He said that the victim responded, "'Things just happen.'" At that point, the defendant

grabbed his arm, and the nine millimeter discharged above the victim's head. He went to his father-in-law's house after that, and his father-in-law, the co-defendant, called 911. Mr. Davidson said that he returned to the house and saw the co-defendant shoot the victim with the .22 caliber rifle. He said that the rifle was approximately four inches from the victim's head. Mr. Davidson agreed that on the day of the shooting, he gave a statement to police in which he said that he was in the bathroom of their house the entire time. He could not recall whether he told police that he heard the defendant say, "'[Y]ou ain't going to do this to me anymore.'" Mr. Davidson said that he did not tell police about the nine millimeter handgun that day. He also said that he did not tell police that the co-defendant was involved because the co-defendant threatened his life if he told. Mr. Davidson said that he told police that the defendant fired all three shots, but that was not the truth. He said that he told Investigator Crouse in May 2008 that he fired the nine millimeter handgun, but because the defendant grabbed his arm, he shot over the victim's head. Mr. Davidson testified that in May, he told police that he did not know who fired the third shot, but he said that he testified at the preliminary hearing that the co-defendant fired the third shot. Mr. Davidson said that he spoke with Guy Buck, an investigator working for the defendant, and did not tell Mr. Buck about the co-defendant's involvement. He could not recall what he told Mr. Buck.

On cross-examination, Mr. Davidson said that he lied to the police because of the co-defendant's threats. He testified that after he told the police about the threats, he wore a wire to attempt to record the co-defendant's making a threat but was unsuccessful. Mr. Davidson remembered that he told Mr. Buck that he had a nine millimeter pistol that was in the co-defendant's possession. Mr. Davidson testified that the co-defendant told him that his lawyer suggested that he get Mr. Davidson to confess to shooting the victim so that it would be easier for the defendant.

On re-direct examination, Mr. Davidson said that the defendant's attorney was the person who told the co-defendant to get Mr. Davidson to confess so that things would be easier for the defendant. He testified that he burned the gloves and hat he had been wearing during the shooting because he fell into the victim's blood when attempting to clean it. He further testified that the co-defendant took the nine millimeter away from him because he unknowingly had it cocked when he went into the co-defendant's home.

Jonathan Plunk testified that he gave a statement to the police in which he recounted a conversation he had with Timmy Davidson. He said that the day before the victim died, Mr. Davidson asked him to drive him around to look for the victim. When he responded that he did not want to, Mr. Davidson asked him to "deal with" the victim. Mr. Plunk testified that Mr. Davidson offered to let him keep money that he owed to Mr. Davidson and also offered him the money in his wallet. Mr. Plunk said that he refused to participate.

On cross-examination, Mr. Plunk said that he did not volunteer his statement to police but told the investigator the information a year after the incident.

David Ashbrook testified that Timmy Davidson asked him if he had a gun for sale or if he knew anyone who had a gun for sale. He said that Mr. Davidson explained that he wanted a handgun to kill the victim and asked Mr. Ashbrook if he had heard about the rape.

Guy Buck testified that he was a licensed private investigator. He said that he interviewed Timmy Davidson and that Mr. Davidson admitted that he had been in possession of a weapon on the day the victim died but denied shooting the weapon.

On cross-examination, Mr. Buck said that Mr. Davidson told him that he left the nine millimeter handgun at the co-defendant's house. Mr. Buck said that he photographed the nine millimeter in the co-defendant's house.

The co-defendant testified that the defendant was his daughter. He said that on March 24, 2008, he saw Mr. Davidson running towards his house. He met Mr. Davidson on the porch, and Mr. Davidson told him that the defendant had shot the victim and that they needed to call 911. The co-defendant said that Mr. Davidson was carrying a handgun that was cocked and, he assumed from the smell of gunpowder, had recently been fired. He testified that he disarmed Mr. Davidson and hid the gun from him. He said that Mr. Davidson disposed of a glove he had by throwing it into a barrel that he was using to burn trash. The co-defendant called 911 and then went to the Davidsons' house. He saw the defendant holding the rifle and "jumping up and down on the ground by the door." The co-defendant said that she appeared scared. He testified that he took the rifle from her and went inside the house. He approached the victim to determine if the victim was alive or deceased and if he was armed. The co-defendant said that the victim was a threat to the defendant because he had raped the defendant at knife point. He testified that he saw the victim move, heard him make a sound, and then "the gun went off." The co-defendant said that he shot and killed the victim. He testified that he did not tell the defendant to finish the job nor did he tell Mr. Davidson to lie about what happened.

On cross-examination, the co-defendant agreed that he did not reveal his involvement until questioned by law enforcement in August 2008. He recalled that he told Investigator Crouse that he asked the defendant whether the victim was dead and that she responded that "she didn't know, but if he got up she would shoot him again." The co-defendant testified that when he took the rifle from the defendant, he assumed it was loaded.

Following the close of proof and deliberations, the jury convicted the defendant of the lesser included charge of attempted first degree murder, a Class A felony.

The court held a sentencing hearing on August 11, 2009. The state submitted the defendant's presentence report as an exhibit. The defendant testified that her husband suggested luring the victim to their home but admitted that she made the phone call. She said that she had received treatment for social anxiety disorder for ten years. She maintained that she shot the victim in self-defense.

The trial court found that the defendant was a leader in the commission of the offense. The court also considered that her testimony at the sentencing hearing lacked credibility and that confinement was necessary to protect society and serve as a deterrent. The court found that no mitigating factors applied to the defendant. The court sentenced the defendant to twenty-three years as a Range I, standard offender, in the Tennessee Department of Correction.

The defendant filed a motion for new trial on September 16, 2009. The court held a hearing on October 7, 2009, and denied the motion by written order on November 16, 2009. The defendant filed a notice of appeal on November 6, 2009.

**Analysis**

The defendant presents three issues for our review. First, she contends that the trial court erred by denying her motion for bill of particulars because the indictment did not reveal the state's theory of liability. Secondly, she argues that the trial court did not allow a full cross-examination of the state's witnesses. Finally, she argues that the trial court erred in sentencing by finding that the defendant was a leader in the commission of the offense and by not finding any mitigators. The state responds that the defendant waived our review of her first two issues -- the denial of her motion for a bill of particulars and denial of full cross-examination -- by filing her motion for new trial outside of the thirty-day limit. The state further argues that this court should dismiss this appeal because the defendant did not timely file her notice of appeal.

*I. Waiver*

A motion for new trial "shall be in writing or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). This provision is mandatory, and the time for filing may not be extended. *See* Tenn. R. Crim. P. 45(b)(3); *see also State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997); *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). The thirty-day provision is jurisdictional, and an untimely motion is a nullity. *Dodson*, 780 S.W.2d at 780. It deprives the appellant of the opportunity to argue on appeal any issues that should have been raised in the motion for new trial. *Martin*, 940 S.W.2d at 569. "The fact that a trial judge

erroneously considers and rules upon a motion that has not been timely filed does not validate the motion . . . ." *Dodson*, 780 S.W.2d at 780. Furthermore, the untimely filing of a motion for new trial does not toll the time for filing a notice of appeal; thus, an untimely motion for new trial will also result in an untimely notice of appeal. *See State v. Davis*, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987). Unlike the untimely filing of the notice of appeal, this court does not have the authority to waive the untimely filing of a motion for new trial. *See* Tenn. R. App. P. 4(a); *State v. Givhan*, 616 S.W.2d 612, 613 (Tenn. Crim. App. 1980). However, this court, in its discretion, may take notice of plain error which affects a substantial right of the defendant where it may be necessary to do substantial justice. Tenn. R. App. P. 36(b); *State v. Johnson*, 980 S.W.2d 414, 418 (Tenn. Crim. App. 1998).

In this case, the defendant filed her motion for new trial on September 16, 2009, more than thirty days after the court entered the sentencing order. Therefore, she cannot now argue issues that she should have raised in a timely motion for new trial. Additionally, the defendant has not shown that consideration of these issues is "necessary to do substantial justice," so we decline to review the issues for plain error. *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000). We conclude that the defendant has waived her arguments that the trial court erred by denying her motion for a bill of particulars and by limiting defense counsel's cross-examination of state's witnesses.

The defendant's filing of an untimely motion for new trial did not toll the time for filing a notice of appeal. *See Davis*, 748 S.W.2d at 207. A notice of appeal must be filed within thirty days after the date of entry of the judgment from which the petitioner is appealing. Tenn. R. App. P. 4(a). A notice of appeal is not jurisdictional, and the requirement for an untimely notice of appeal may be waived in the interest of justice. *Id.* Here, the court entered the judgment on August 12, 2009, and the defendant filed her notice of appeal on November 6, 2009, well after the thirty-day limit. However, because of the nature of the defendant's conviction and the length of her sentence, we conclude that it is in the interest of justice to review her issues regarding sentencing, which were not waived by her untimely filing of the motion for new trial.

*II. Sentencing*

The defendant argues that the trial court erred by finding that she was a leader in the commission of the offense and by not finding that mitigating factors applied in this case. Specifically, the defendant contends that (1) the court's finding of the enhancement factor violated her right to a jury trial; (2) without evidence of communication between the defendant and her co-defendant, the court's finding of the enhancement factor was inappropriate; and (3) the trial court erred by finding that the defendant did not meet her burden of establishing the applicability of mitigating factors.

An appellate court's review of a challenged sentence is *de novo* on the record with a presumption the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). The Sentencing Commission Comments to this section of the statute indicate that the defendant bears the burden of establishing that the sentence is improper. When the trial court follows the statutory sentencing procedure and gives due consideration to the factors and principles relevant to sentencing, this court may not disturb the sentence. *See State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008).

In this case, the defendant, as a Range I, standard offender, was subject to a sentence of fifteen to twenty-five years for attempted first degree murder, a Class A felony. Tenn. Code Ann. § 40-35-112(a)(1). The trial court sentenced her to twenty-three years after finding that she was a leader in the commission of the offense. The court considered the mitigating factors presented by the defendant but found that none applied.

### A. Right to Jury Trial

Initially, we conclude that the defendant's argument that the trial court's finding of the enhancement factor violated her right to a jury trial is without merit. In *Blakely v. Washington*, the United States Supreme Court held that the Sixth Amendment right to a jury trial requires that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Blakely*, 542 U.S. 296, 301 (2004) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)). The court emphasized that "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." *Id.* at 303-04. The court further noted that the Sixth Amendment right to a jury trial is "no mere procedural formality, but a fundamental reservation of power in our constitutional structure." *Id.* at 305-06.

Thereafter, in *Cunningham v. California*, 549 U.S. 270 (2007), the United States Supreme Court extended the *Blakely* analysis to California's determinate sentencing scheme. In doing so, the court noted:

> We cautioned in *Blakely*, however, that broad discretion to decide what facts may support an enhanced sentence, or to determine whether an enhanced sentence is warranted in any particular case, does not shield a sentencing system from the force of our decisions. If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied.

*Cunningham*, 549 U.S. at 290 (citing *Blakely*, 542 U.S. at 305 and n. 8)

"In order to avoid the constitutional violation arising from a trial court increasing a presumptive sentence on the basis of judicially-determined enhancement factors," the Tennessee General Assembly amended Tennessee Code Annotated sections 40-35-102, -210, and -401, effective June 7, 2005, to reflect the advisory nature of enhancement factors. *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). The amendment, among other things, removed the presumptive sentence language from our Sentencing Act and mandated only that the trial "court shall impose a sentence within the range of punishment . . . ." *Compare* Tenn. Code Ann. § 40-35-210(c) (Supp. 2005) *with* Tenn. Code Ann. § 40-35-210(c) (2003). The General Assembly also provided that this amendment would apply to defendants who committed a criminal offense on or after June 7, 2005. *See* 2005 Tenn. Pub. Act ch. 353, § 18.

The defendant in this case committed the offense after the effective date of the 2005 amendments to the Sentencing Act. Therefore, her contention that the trial court erred by applying sentencing factors that a jury had not found beyond a reasonable doubt or that the defendant had not admitted is without merit because the General Assembly amended the Sentencing Act, rendering the enhancement factors advisory, in order to avoid a constitutional violation under *Blakely*.

### B. Enhancement and Mitigating Factors

Prior to 2005, the Sentencing Act set forth a "presumptive sentence" to be imposed within the applicable range: the minimum sentence for all felonies other than Class A felonies, and the midpoint sentence for Class A felonies. Tenn. Code Ann § 40-35-210(c) (2003). Pursuant to the 2005 amendments, our Sentencing Act has abandoned the statutory minimum sentence and renders enhancement and mitigating factors advisory only. *See* Tenn. Code Ann. §§ 40-35-114, -35-210(c). The 2005 amendments set forth certain "advisory sentencing guidelines" which the trial court is required to consider but is not bound by. *See id.* § 40-35-210(c). Although the application of factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court is also required to place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, to ensure fair and consistent sentencing." *Id.* § 40-35-210(d). Once applied, the chosen enhancement factor becomes a sentencing consideration subject to review under Tennessee Code Annotated section 40-35-401(c)(2). Thus, while the court can weigh enhancement factors as it chooses, the court may only apply the factors if they are "appropriate for the offense" and "not already an essential element of the offense." *Id.* § 40-35-114. The trial court must find facts related to sentencing by a preponderance of the evidence rather than beyond a reasonable doubt. *State v. Winfield*, 23 S.W.3d 279, 283 (Tenn. 2000).

The evidence at trial and the defendant's testimony at her sentencing hearing established that she lured the victim to her house by calling him and that she fired the first two shots. The state presented some evidence that she and her co-defendant had a conversation about whether the victim was alive before the co-defendant fired the third shot. Based on the defendant's actions, we conclude that the trial court did not err in its determination that the defendant was a leader in the commission of an offense involving two or more criminal actors. Furthermore, the trial court considered each mitigating factor presented by the defendant and placed its reasons for not applying the mitigation factors on the record, which does not preponderate against the court's determination. Therefore, we conclude that the trial court followed the statutory sentencing procedure and gave due consideration to the factors and principles relevant to sentencing, and we will not disturb its sentence.

## Conclusion

Based on the foregoing reasons, we affirm the judgment of the trial court.

_____
J.C. McLIN, JUDGE